## Commonwealth *v.* National Oil Company, Ltd., Appellant.

*Taxation—Manufacturing company—Oil company.*

A limited partnership association organized for the purpose of manufacturing refined oils from crude petroleum, and for the acquisition of necessary lands, leases, rights, tanks, etc., is subject to taxation on the portion of its capital invested in the business of mining and transporting crude petroleum, but is exempt as to the portion of its capital invested in manufacturing, under the act of June 1, 1889, P. L., 431.

*Taxation—Classification—Uniformity—Act of June* 1, 1889—*Art.* 9, § 1, *Const.*

The act of June 1, 1889, P. L. 420, making the capital stock of corporations a distinct class of investments for the purpose of taxation, does not violate article 9, § 1, of the constitution, as to uniformity of taxation.

Argued June 2, 1893. Appeal, No. 23, May T., 1893, by defendant, from judgment of C. P. Dauphin Co., March T., 1892, No. 172, for plaintiff, on appeal from tax settlement. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL, DEAN and THOMPSON, JJ.

Appeal from tax settlement. Before McPHERSON, J.

The case was tried by the court without a jury, the facts being found as follows :

" 1. The defendant is a limited partnership, organized in April, 1887, under the limited partnership act of 1874, for the purpose of ' manufacturing refined oils from crude petroleum and the manufacture of the commercial products of crude petroleum produced or purchased by the association for those purposes, and the acquisition of such necessary lands, leases, rights, tanks, stills, pipes, patent rights, devices and appliances for use in such business, and for receiving, conveying, storing and care of crude petroleum for the purpose of manufacturing and sale of manufactured products." It has a capital of $300,000.

" 2. During the tax year ending the first Monday of November, 1890, it declared dividends amounting to six per cent, and a tax of three mills was accordingly laid upon its whole capital under the twenty-first section of the revenue act of 1889. On December 4, 1891, it paid $450 to the state treasurer on account of the tax now claimed.

" 3. During said year $150,000 of its capital was invested in the manufacturing of refined oil and $150,000 in oil producing property, and in the business of mining and transporting crude petroleum. It does not appear whether all of the crude petroleum produced by the defendant was used or intended to be used by itself or whether some of it was sold to others.

" 4. The defendant can conduct its business of refining more economically and safely if it does not depend upon others for its supply of crude petroleum, but produces and transports for itself as much as it may need. From the evidence before us, however, we are unable to find as a fact that it is necessary for a refiner of petroleum to be also a producer and transporter. It is no doubt convenient and desirable, but it has not been shown to be essential.

" CONCLUSIONS OF LAW.

"For the purposes of this case the character of the defendant is to be determined by an inspection of its articles of association, and not by an examination of the business in which it is actually engaged. If its articles give it manufacturing powers and no others, it is exclusively organized for manufacturing purposes within the meaning of the revenue act of 1889; and this would be so, even if a part of its capital was employed in a business which it had no corporate power to conduct: Commonwealth v. William Mann Company, 150 Pa. 64. But if its articles contain powers which are neither manufacturing nor necessarily incident to manufacturing, it is not exclusively organized for manufacturing purposes, and its whole capital is taxable, although all of it may be actually employed in a strictly manufacturing business : Commonwealth v. Westinghouse Electric and Manufacturing Company, 151 Pa. 265. (See also the opinion, filed herewith, in Com. v. Thomas Iron Co., No. 464, June term, 1892, Dauphin C. P.) Tried by this test, the defendant is not organized exclusively for manufacturing purposes. Its articles of association give it two distinct powers, one of

them a manufacturing power, namely: to produce refined oil and other commercial products from crude petroleum; and the other, a mining and transporting power, namely: to buy and lease land, to mine for and produce crude petroleum therefrom, and to transport the same to its refineries. Clearly, this is more accurately described as mining than as manufacturing. In a qualified sense, oil is a mineral, Stoughton's Appeal, 88 Pa. 198; Dunham v. Kirkpatrick, 101 Pa. 43; and to search for it, to liberate it after it has been found, and to transport it to customers, is not a process of manufacture, whether the scope of this word be looked for in the dictionaries or be collected from an examination of particular acts of assembly. In the language of a very recent case, the production of petroleum is ' the mere appropriation of an article that is furnished by nature:' Commonwealth v. Northern Electric L. and P. Co., 145 Pa. 117. If, therefore, the defendant had been merely an oil producing association, there would be no doubt as to its liability to taxation upon its whole capital.

" Being also an oil refining association, however, and, therefore, in part a manufacturer, this question alone remains: Is its oil producing power necessarily incident to its manufacturing power? If not, if the two are only united for business convenience, or for the sake of economy or prudence, their union is the union of two independent franchises, and prevents the defendant from successfully claiming to be exclusively organized for manufacturing purposes.

" It is a question of fact, depending upon the evidence before us, why and to what end this union exists; but after the facts have been found to be as above stated in paragraph 4, it has been authoritatively decided that the one power is not necessarily incident to the other. In Commonwealth v. Lackawanna Iron & Coal Co., 129 Pa. 357, a closely analogous case, the court, speaking of the union of mining, quarrying and manufacturing powers, say: 'Strictly speaking, both of these (namely, coal property and ore property) pertain to mining, rather than to manufacturing corporations. Neither of them has any necessary connection with the latter. True, they are sources from which corporations engaged in manufacturing iron necessarily draw their chief supply of raw materials, but those materials always may be, and frequently are, obtained from

parties or corporations independently engaged in mining and supplying the same to manufacturers of iron and others. It is doubtless a great convenience and advantage for an iron manufacturing company to own and operate its own coal and iron ore mines, but the fact that such corporation is also specially authorized to do so, is no reason why so much of its capital as is invested in such mining operations should enjoy the benefit of exemption from state tax designed to relieve manufacturing, as contra-distinguished from mining corporations, from a burden they were supposed to be illy able to bear.

" ' A company incorporated for the exclusive purpose of manufacturing steel rails, for example, is not authorized by its charter to own and operate coal mines, iron ore mines or limestone quarries, and would of course be obliged to procure its supplies of raw material from outside sources. Such mining and quarrying operations are not legally incident to the business of manufacturing, that is to say, they do not necessarily depend upon it, although as a matter of fact, the supplying such raw materials is in one sense incident to the process of manufacturing. If the business of mining and supplying such raw materials is not necessarily incident to a strictly manufacturing franchise, it cannot become so because that franchise is exercised concurrently with the separate franchises of mining and quarrying. As we have seen, the corporation appellee is of a fourfold character. It is a coal mining company, a quarrying company, an iron ore mining company, and a manufacturing company, specifically invested with the distinct rights and privileges pertaining to each, and exercising all of them. In the exercise of its manufacturing franchise, it finds it convenient and profitable to become in the main the consumer of products resulting from the exercise of the other three. In other words, the mining and quarrying departments, so to speak, find a convenient customer in the manufacturing department. But how can it be inferred from this that the capital employed in the mining and quarrying departments of the business is relieved from state tax, because capital employed in manufacturing happens to be exempt? Such a conclusion would be as unjust as it is illogical. It relieves from taxation capital which the legislature never intended to exempt, merely because it happens to belong to a corporation which owns and controls

other capital which for a special reason the legislature has seen fit to exempt.'

" In our opinion this is decisive, and requires us to hold that upon the facts as we have found them the defendant's oil producing power is not necessarily incident to its power to refine.

" If we were at liberty to apportion this tax we would gladly do so, but the case is precisely within the ruling of Commonwealth v. Westinghouse Electric and Manufacturing Company, supra, and we must therefore sustain the settlement upon the whole capital.

" While, however, in this case and in others we have cheerfully obeyed the decisions made last year (reported in 150 and 151 Pa.), and do not question in the least the soundness of the abstract reasoning upon which they rest, we have met with so many practical difficulties in the effort to follow them that we respectfully request the Supreme Court to reconsider those decisions, and in the light of these unforeseen obstacles to reverse the judgment we are about to enter and declare taxable only so much of the defendant's capital as is not invested in its manufacturing operations.

" The phrase used by the act of 1889—' exclusively organized '—is confessedly ambiguous. Its meaning in the statute may differ from its meaning in the dictionaries, and evidently depends upon the point of time which is relied upon as fixing the character of the corporation for the purpose of this particular tax. If the time of granting the charter is taken, no other conclusion can rationally be reached than that which has been announced in the cases referred to ; but if the time of imposing the tax is taken, then the actual business of the corporation is the natural test. This, we respectfully submit, may fairly be concluded to have been the legislative intention, because (the language being doubtful) this construction allows apportionment wherever justice and equity demand it, and thus avoids the inequality of burden which otherwise must result ; while the construction now adopted forbids apportionment altogether in a large number of cases, the inevitable result being much friction and unintended injustice.

" We may be permitted to give a few examples of inequality. Here are two iron manufacturing companies, alike in all respects except that the charter of one contains a power to mine ore or

coal.   This power is not used and never has been used; never-theless, although their business is precisely similar, one is ex-empt and the other is taxed.   Again, the general corporation act of 1874, under which the majority of charters now exist, gives mining powers in § 38 to certain manufacturing compa-nies.   What is to be done with this class of cases?   Are these mining powers to be considered as written in the charters, al-though they are not formally expressed?   If so—and § 25 of the act of 1874 declares that 'the franchises granted shall be construed according to the same rules of law and equity as if (the corporation) had been created by special charter'—there is not an iron manufacturing company in the state, incorpo-rated under the act of 1874, which is entitled to exemption. On the contrary, all are already liable for considerable arrears. But, if these powers are not to be considered as written in the charters, with what justice is the tax imposed on a corporation chartered by a special act, merely because the right to mine is specially given?   The right exists as really in the one case as in the other, and ought to affect both corporations alike.

"Take also the case of two corporations doing a similar manufacturing business, both of which are usurping a power not given by their charters, but only one of which possesses an unused franchise which is not manufacturing.   Surely, both ought to be treated alike; and yet, one is taxed only upon the capital invested in the unauthorized business, and the other is taxed upon its whole capital stock, although the operations of the two companies are identical.   And this inequality becomes more conspicuous, if the case is slightly varied and two corpo-rations are considered, one of which has an exclusively manu-facturing charter, but is usurping another franchise, while the other has a similar manufacturing power and in addition pos-sesses the franchise to do lawfully what the other is doing unlawfully.   If any discrimination is to be made, it would seem that the violator of law should bear the heavier burden.   But the fact is otherwise; the usurper pays tax only upon the cap-ital unlawfully invested, while the other is taxable upon its whole capital stock.

"Additional examples might be given, but these may suffice, for a moment's thought will bring to mind the slate companies, the coke companies, the fire brick companies and others of

that class, to say nothing of many others that possess special charters containing particular privileges. We will only add, that the examples we have given are neither fanciful nor imaginary, and that we would not have made this unusual application if we were not abundantly convinced by our experience (which necessarily embraces a large number of cases that are not brought to the attention of the Supreme Court) that it is hardly possible to apply the present rule without severe and extensive hardship. Unquestionably serious practical difficulties exist and very considerable numbers of corporate taxpayers are either injured or threatened, because of the rule we are now bound to apply. We venture to express the hope, that a reconsideration of the subject will find no serious obstacle to adopting the alternative construction of a doubtful phrase, and may thus permit us to return to the hitherto well-established and equitable rule of taking the actual business as the test of corporate character. This inevitably leads to apportionment in all proper cases, and, with restored freedom of apportionment, these difficulties will disappear. So diverse and multiform are the charters and the powers and the actual business of manufacturing corporations that, without a full power to apportion, they can neither be fairly exempted nor fairly taxed."

The court entered judgment for the amount of tax on the whole capital. Defendant appealed.

*Error assigned* was entry of judgment.

*Lyman D. Gilbert, John H. Weiss* and *Roger Sherman* with him, for appellant, cited: Hawes v. Anglo-Saxon P. Co., 101 Mass. 385; Norris Bros. v. Com., 27 Pa. 494; Com. v. Westinghouse Air Brake Co., 151 Pa. 276; Com. v. Westinghouse Electric Mfg. Co., 151 Pa. 265; Com. v. Lackawanna I. & C. Co., 129 Pa. 346; Imperial Ref. Co., Ltd., v. Wyman, 6 Ry. & Corp. L. J. 94 (U. S. C. Ct.); Rogers Printing Co. v. Santa Clause Co., Ltd., 2 Pa. C. C. R. 529; Kitchenman v. Tidewater Pipe Co., Ltd., 108 Pa. 630; Lennig v. Penn. Morocco Co., 16 W. N. 114; Act of March 21, 1836, P. L. 143; Boston R. R. v. Pearson, 128 Mass. 445; Kittanning Coal Co. v. Com., 79 Pa. 100; Fox's Ap., 112 Pa. 337; Com. v. Standard Oil Co., 101

Pa. 119; R. R. v. Maryland, 21 Wall. 456 ; Paul v. Virginia, 8 Wall. 168; Com. ex rel. Fertig v. Patton, 88 Pa. 258; Com. v. Germania Brewing Co., 145 Pa. 83; Londonderry Township v. Berger, 2 Pears. 230; Bank of Columbus v. Hines, 3 Ohio, 1; Pine Grove Township v. Talcott, 19 Wall. 666 ; Durach's Ap., 62 Pa. 491.

*James A. Stranahan,* deputy attorney general, *W. U. Hensel,* attorney general, with him, for appellee, cited : Com. v. Lackawanna Iron & Coal Co., 129 Pa. 346 ; Com. v. Northern Electric Light & Power Co., 145 Pa. 105.

OPINION BY MR. JUSTICE WILLIAMS, October 2, 1893:

This is another case in which a manufacturing company is attempting to supply itself with the raw material it needs by production instead of purchase. It is ruled by Commonwealth v. Juniata Coke Company, and Commonwealth v. Savage Brick Company, [the preceding cases,] decided at the present term and in which opinions are herewith filed.

Another question has been raised in this case and urged with earnestness and ability. It is that of the constitutionality of the act of 1889, particularly of that portion of it which makes the capital stock of corporations a distinct class of investments for the purposes of taxation. We have recognized this form of classification for taxing purposes in many cases, particularly in Kittanning Coal Company v. Commonwealth, 79 Pa. 100; Kitty Roup's Case, 81* Pa. 211 ; City of Williamsport v. Brown, 84 Pa. 438 ; Commonwealth v. Delaware Division Canal Company, 123 Pa. 594 ; Commonwealth v. The Brewing Company, 145 Pa. 85. Upon the subject of uniformity of burden imposed by a tax law, no better rule can be stated than that laid down in Fox's App., 112 Pa. 337, viz., that substantial, not absolute, uniformity is what the constitution requires. Exact uniformity is theoretically possible, but it is practically unattainable by any systems of classification and valuation yet devised in this state.

We decline to reopen this question, and reply stare decisis, to the ingenious and learned argument of the appellant in support of his position.

This is a case for apportionment, and the judgment is reversed and the record remitted, that this may be done by the court below.

See also the next case.

