Gulf Oil Corp., Appellant, *v.* Philadelphia.

Argued January 7, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Charles E. Kenworthey,* with him *Louis F. Floge, William A. Schnader* and *Schnader, Kenworthey, Segal & Lewis,* for appellant.

*Joseph H. Lieberman,* with him *Frank F. Truscott,* City Solicitor, *Michael D. Hayes,* Assistant City Solicitor, and *C. Brewster Rhoads,* for appellees.

*J. H. Ward Hinkson,* for amicus curiæ.

OPINION BY MR. CHIEF JUSTICE MAXEY, May 28, 1947:

The question before us is whether or not certain tanks of appellant's oil refinery used in the course of its refining operations are within the provisions of the Act of June 3, 1915, P. L. 787, 53 PS 4742, which exempts from taxation "machinery used in manufacturing".

Appellant is a Pennsylvania corporation engaged in the manufacture of gasoline and various petroleum products at its Philadelphia refinery. The City Board of Revision of Taxes in making assessments of appellant's lands and improvements for taxation purposes for the year 1945 included the appraised value of certain tanks maintained on appellant's premises. Appellant objected to the inclusion of a number of specifically designated tanks among the assessed realty and appealed from the assessment on the ground that such property was improperly taxed in violation of section 1 of the Act of June 3, 1915, P. L. 787, 53 PS, 4742, which provides that; ". . . in cities of the first class, the assessment of real estate for taxation, the machinery and tools used in manufacturing in any mill or manufactory shall not be considered or included in determining the value of real estate . . ."

The taxpayer filed two appeals with the Board of Revision of Taxes since the property in question was divided property and each portion was separately assessed. The Board concluded that the tanks on the property were part of the real estate and not machinery. The taxpayer appealed to the Common Pleas Court. There were two appeals by the taxpayer and these were tried together before Judge Mawhinney on June 6, 1945. The court dismissed the appeals on October 25, 1945, whereupon exceptions were filed on November 18, 1945, by the taxpayer. On December 19, 1945, the exceptions were dismissed by the Court en banc and the dismissal was followed by the final decree on January 16, 1946. This appeal followed.

Appellant contends that all of the tanks in dispute are used in one or more processes of manufacturing various refined petroleum products consisting of gasoline of various octanes and blends, toluene, iso-paraffin, distillate fuel oil, lubricating oil, residual fuel oil and wax. The manufacture of these products, according to appellant, comprehend generally (1) cleaning the crude oil by removing water, salt, dirt and other impurities, (2) fractionating off uncracked gasoline, distillate fuel oils and unrefined lubricating stocks, (3) cracking the resulting oil and distillates into gasoline and residual fuel oil, (4) chemically treating the various oils and waxes resulting from the fractionation and cracking, and, finally, blending, dyeing and adding various chemicals to meet specifications for marketable product. Appellant maintains that the great majority of the tanks included in the assessment are used to remove water and sediments from crude petroleum before it is or can be charged to the stills, by heating the oil in tanks equipped with steam coils and settling the oil; as receptacles for the products of various batteries or groups of stills designed to process certain specific types of crude oils, prior to and for the purpose of drying the products of the stills to remove traces of moisture; for the purpose

of adding chemicals to complete the finished product; and for other manufacturing purposes. Circulating pumps, pipe lines, valves and heating, steam and air blowing systems are connected directly to the tanks, which altogether constitute integral parts of appellant's manufacturing machinery. Appellant also avers that the few remaining tanks, used as receptacles for finished products, contain valves, pipes, pumping equipment, measuring devices and other equipment, that these tanks are necessary to the manufacturing process of appellant as receptacles for the products of its stills, and that the same constitute parts of appellant's manufacturing machinery.

Appellant's witness, Max Plant Edgley, Assistant Superintendent of the Philadelphia refinery, attempted to establish a distinction between mere storage tanks and tanks employed for various blending and other processes. The latter, in appellant's estimation, fall within the classification of "machinery used in manufacturing" and thus are entitled to the benefits of the tax exemption conferred by the Act of 1915, supra. This witness in explaining the function of tanks in refining crude oil used a chart, exhibit No. 1, which showed the position, function and the necessity of each tank in the manufacture or processing of gasoline and the various petroleum products produced at the plant. This witness stated: "I have only one thing to say, that might sum up this whole dissertation, or whole description, and that is, with the exception of these thirteen tanks which we say are shipping tanks, that if you were to remove the rest of these tanks from the refinery, you could no more manufacture a product than if you did not have any stills or pumps. In other words, to me it is just as much machinery as your cracking units or your pumps or anything else that you have got in your refinery. They are absolutely necessary."

Appellees offered in rebuttal the expert testimony of Dr. William A. Malisoff, member of the Association of

Consulting Chemists and Engineers; former director of
organic research for the Atlantic Refining Company and,
at the time of the testimony, professor of bio-chemistry
at Essex College of Medicine, Newark, New Jersey. The
court asked this witness this question: "Doctor, the tanks
which are not treated as storage tanks, for the purpose
of shipment either by truck or otherwise to the plant of
this company, is there any manufacturing process that
goes on in these tanks in addition to, as you say, that
they are used as storage tanks?"

The answer was: "Well, things do happen in the
tanks, happen in storage tanks. . . . Very often things
are done in the tanks to the extent of adding some in-
gredient or agitating the contents for a purpose. I would
call that processing. And I reached the conclusion that
some processing was going on in these tanks. Not all of
them, but in some of them."

Further questioning of this witness elicited the fol-
lowing answer: ". . . Now I did not call any of these
tanks in which some process went on manufacturing,
because a process is not a machine. I can explain that
if I am questioned further . . . I state that blending
tanks are essentially storage tanks unless they are equip-
ped specifically and only for the purposes of mixing by
means of stirrers or air currents and the like. The ma-
terial being blended being immediately or continuously
withdrawn into storage elsewhere, merely allowing mix-
ing to take place during storage, only underscores the
fact that the storage period is long enough to accom-
plish that. Mechanical mixing can be accomplished at
the junction of feed pipes fed by proportion pumps and
does not require the entire storage tank for the purpose
. . . And the question at issue, it seems to me is what
is going on within that tank: is there a manufacturing
going on? or is there a process of change going on?
and is that what is done when you run a machine like
a cracking unit or a still?"

Certain statements of the court below (though not made as formal findings) should logically have led to the conclusion that these tanks are part of the machinery used in manufacturing oil. The court said: "It is evident that the appellant is engaged in refining oil and therefore [is] a manufacturer: Com. v. National Oil Co., Ltd., 157 Pa. 516.[1] By its process, through the various types of tanks, crude oil is made into the products already enumerated. The evidence shows that these tanks are very large, that they rest upon concrete bases, making use, because of their enormous weight, of the law of gravity to hold them in place on heavy concrete bases erected on and in the land beneath them; that they have been placed there as a necessary part of the operations conducted by the appellant and are there to carry out the permanent purposes of the manufacturing plant."

The court below then posed the question whether the tanks, or any of them, constitute "machinery and tools used in manufacturing in any mill or manufactory" and answered it *negatively*. The *first* reason the court adduced for its conclusion is that the tanks "are not intended to apply force or involve the quality of motion; they are static and have the same characteristics as the walls of a mill or of a silo. The majority of the tanks are used for storage purposes primarily, although it was testified that in certain of them certain processes take place—such as heating, settling, blending and filtering. But, the fact that a process of some kind takes place in the oil that is stored in the tanks, does not make them machines . . . In Denning Wire & Fence Co. v. American Steel & Wire Co. of New Jersey, 169 F. 793, 795, the court said: 'The term "machine" includes every mechanical device or combination of mechanical powers

---

[1] In this case in 157 Pa. it was made clear in an able opinion not only that refining petroleum was manufacturing but what which was "necessarily incident" to refining petroleum was a part of manufacturing. The decision held that the *production* of crude petroleum from the ground and its *transportation* were not manufacturing.

and devices to perform some function and produce a certain effect or result. But where the result or effect is produced by chemical action, by the operation or application of some element or power of nature, of one substance to another, such modes, methods, or operations are called "processes".' "

But the *Denning Wire & Fence Co.* case cited by the court below was a *patent* case which decided "That the mere function or operations of a machine, or other device itself, are not the subject of a patent." This is *not* the question *before us*. The opinion in the *Denning* case cited *Corning v. Burden,* 56 U. S. 252, 14 L. Ed. 683, in which the United States Supreme Court held that Burden's patent "for rolling puddler's balls" was "for a machine and not for a process" and it declared "it is well settled that a man cannot have a patent for the function or abstract effect of a machine, but only for the machine which produces it." That decision has no applicability whatsoever to the question now before us. The question now before us is *whether or not certain parts of a manufacturing establishment called tanks in which there take place functions, both chemical action and mechanical action, which are essential to the production of the thing (refined oil) for which the manufactory was built constitute a part of the machinery of that establishment as the word machinery is used in the Act of 1915, supra.*

The language of the first half of the excerpt cited by the court below from the *Denning Wire & Fence Co.* case, supra, is helpful in solving the question now before us. That language is that the term "machine includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result." The tanks in question *were* a combination of mechanical powers and devices whose function was to produce a certain effect or result.

But the court below (following the line of argument of Professor Malisoff) took the second half of the excerpt from the *Denning Wire & Fence Co.* case as the *second*

basis for its conclusion. It decided that since what took place in the tanks was "chemical" action and not "mechanical" action, the name to apply to it was "processing" and that processing was not manufacturing and since it was not manufacturing, the tanks which were necessary to this processing were not machinery. This conclusion was inconsistent with the court's earlier statement that "these tanks" are "a necessary part of the operations conducted by the appellant." This statement by the court is supported by witness Edgley's uncontradicted testimony that "until these chemicals are added the gasoline is not a marketable product . . . because you can't finish manufacturing the gasoline until these chemicals are added; and the addition of those chemicals is as much of a manufacturing procedure as your cracking stills are." Since the tanks in whose contents chemical changes are mechanically made are a necessary part of the appellant's oil refinery, it follows that they are an integrated part of the machinery of manufacturing.

There is an analogy between the problem before us and the problem whether a certain machine is a part of the freehold. The criterion of physical attachment has long been rejected in the solution of that problem. Chief Justice GIBSON in *Voorhis v. Freeman,* 2 W. & S. 116, said in 1841 that in "the old criterion" of "physical attachment" which "was adapted to fixtures and dwellings before England had become a manufacturing country" there was "want of adaptation to the business and improvements of the age" and that the true test was whether the machinery "was palpably an integrant part of a manufactory or a mill", i. e. "was necessary to constitute it and without which it would not be a manufactory at all." See also *Defense Plant Corporation Tax Assessment Case,* 350 Pa. 520, 39 A. 2d 713. The criteria that nothing is machinery unless it "applies force or involves the quality of motion" and that anything in which chemical processes take place even though these

processes are mechanically induced cannot be adjudged machinery, is likewise not adapted "to the business and improvements of the age."

The testimony of Professor Malisoff that "some processing was going on in these tanks", does not warrant the conclusion that the tanks are *not* machinery. The fallacy that tanks or containers in which processing takes place cannot be either machines or machinery proceeds from the erroneous premise that nothing is machinery that does not "apply [physical] force or involve the quality of motion." Before and at the very dawning of the "machine age" when the machinery best known to the public were saw mills and grist mills and later cotton gins and steam engines, it was natural to entertain the concept that all machinery involved motion and anything which did not move was not machinery. The modern "machine age" has outgrown that concept. Much of the machinery today has only passive or motionless functions to perform in manufacturing. For example, in the manufacturing of metal from iron ore, the blast furnace in which smelting takes place is composed of a fire brick lining encased in a steel shell. The ore is reduced to iron by chemical reaction in which certain gases permeate the molten iron. This chemical reaction is a *process* and is expressed in a chemical formula. In the process of smelting, gases permeate the iron ore completely and the freshly reduced iron in the blast furnace picks up the carbon necessary to convert it into the more fusible pig iron, either by physical contact with the hot carbon, or by the gas reaction. The blast furnace in which this process takes place is clearly a part of the machinery of iron manufacture.

It is as logical to hold that the storage tanks in which take place physical and chemical processes [2] necessary

---

[2] The court below found an analogy between the tanks in question and a silo, the implication being that a silo is no part of the machinery of a manufactory and, therefore, tanks are not. A silo is used

to the refining of oil, are machinery as it is to hold that the smelters used in making metal are machinery. Professor Malisoff testified: "Things do happen in the tanks. . . . All storage tanks will settle material that contains moisture, oily materials that contain moisture . . . Very often things are done in the tanks to the extent of adding some ingredient or agitating the contents for a purpose. I would call that processing. And I reached the conclusion that some processing was going on in these tanks."

Likewise, when raw iron is converted into pig iron, certain non-wanted elements are eliminated, some ingredients are added and the contents are "agitated" and all this may be called "processing", but the fact remains that the blast furnace in which this processing takes place is a part of the machinery of iron manufacturing. Steel making is done in a steel vessel or converter weighing from 10 to 25 tons in which is placed pig iron. This is subjected to great heat and certain elements are eliminated and certain elements are added to the molten mass. What *takes place therein* is a *positive* process but while the function of the *steel vessel itself* is *negative,* yet this converter is clearly a part of the *machinery* of steel production. In steel making a metal mixer is always used. That is also a part of the machinery of

for ensilage and the latter is defined as "preserving green crops in a succulent condition." The fodder which is the result of the "preservation" is called silage. Insofar as a silo's function is merely *preservative* it has no part in manufacturing but as the fermentation of the silage in the silo forms certain organic acids which prevent the development of molds on the fodder a silo does have, pro tanto, a part in the manufacturing of silage. The fermentation which goes on in the silo produces, under proper conditions, sweet "silage" as fodder. To that extent the silo may be properly considered as part of the machinery of producing fodder. When a farmer has only one silo he may not regard himself as a manufacturer of silage any more than he would regard himself a manufacturer of butter if he only produced a few pounds of butter each day. But in a literal sense fodder makers and butter makers are engaged in manufacturing. The silo used in fodder making is just as much a part of the machinery of silage making as milk pans and churns are a part of the machinery of butter making.

steel production. Professor Malisoff in his testimony referred to the mixing which takes place in the blending tanks. He contended that: "Mechanical mixing can be accomplished at the junction of feed pipes fed by proportion pumps and does not require the entire storage tanks for the purpose." Whether this mechanical mixing *can* be accomplished as Professor Malisoff testified it can is entirely immaterial. The fact is it *is* accomplished in the "blending tanks." Professor Malisoff characterized certain other tanks in question as "charging tanks" and "surge tanks". Appellant's witness, Mr. Edgley, when testifying, said of what takes place in the blending tanks that it was done "to correct boiling range and vapor pressure for shipment by vessel to white gasoline laboratory tests." He also testified in very technical language as to what takes place in "charging tanks" and "surge tanks". His testimony makes it clear that what takes place in those tanks is all a part of the process of refining oil and that without these tanks "you could [as he said] no more manufacture a product than if you did not have any stills or pumps . . . They are absolutely necessary [to the business of oil refining]." Professor Malisoff said: "I have no reason to question Mr. Edgley's statements at all—I think they have been remarkably accurate—as to what these tanks are, where they belong in the system, and what they are used for." The purport of Professor Malisoff's testimony is that what does take place in these tanks is essential to oil refining but since it is processing, the tanks in which the processing is done are not machinery. If that were so, the smelters used in making iron and the converters used in making steel are not parts of the machinery of, respectively, iron and steel manufacture. We must reject these conclusions.

Processing is a flexible term and it may refer to either chemical or physical changes in the thing acted upon. There is no warrant either in law or lexicology for holding that it excludes the idea of manufacturing

by the use of machines and machinery. In *Corning et al. v. Burden,* 56 U. S. 252, the United States Supreme Court said: "B . . . may invent a new furnace or stove, or steam apparatus, by which this process [therein referred to] may be carried on with much saving of labor, and expense of fuel; and he will be entitled to a patent for his machine . . ."

The court added that the term processing is sometimes "used subjectively or passively as applied to the material operated on, and not to the method or mode of producing that operation, which is by mechanical means, or the use of a machine, as distinguished from a process"; the term processing sometimes "represents the function of a machine, or the effect produced by . . . the machine, . . . Burden does not pretend to have discovered any new process by which cast iron is converted into malleable iron, but a new machine or combination of mechanical devices by which the slag or impurities of the cast iron may be expelled or pressed out of the metal . . . the iron may be said, in the secondary sense of the term, to undergo a process in order to change its qualities by pressing out its impurities, but the agent which effects the pressure is a machine or combination of mechanical devices."

A process and the machinery by which it is accomplished are distinct things. See *Leeds & Catlin Co. v. Victor Talking Machine Co.,* 213 U. S. 301. Processing may take place through either chemical or mechanical action, or through a combination of both. When wet clothes are placed on the line to dry they are being processed into dryness by air and sun. When apple juice is placed in a barrel it ferments into hard cider by chemical action. When wood pulp is converted into paper, the process is partly chemical and partly mechanical.

The processing of oil which takes place in the tanks now under consideration is processing by both chemical and mechanical means. The chemicals which Mr. Edgley

stated are added to the contents of certain tanks are "mixed by means of pumps . . . Suction is taken on the top of the tank and discharged back into the bottom of the tank . . . And you could not [he said] add the chemicals and finish it just with a pump and valves and pipe lines; you have got to have the tank as an integral part of the machine."

The witness referred to tank 243, which is marked "Blending tank for gasoline for charging to the toluene or iso-paraffin plant." He added: "On the right hand side of that block is noted [on the chart] a mixing pump." This and similar testimony as to the physical force applied to the contents of these tanks was unchallenged.

The court's findings that "all of the tanks are used for storage and that only processing, without the application of any forces other than those of nature or chemistry, takes place therein" and that "the tanks are not machinery or tools used in manufacturing", are based on Professor Malisoff's opinion; yet this witness referred to "the action [in the tanks] of producing the blend". He added it "is of very short duration" and that the tanks "are not in every case exclusively storage tanks." The essence of Professor Malisoff's testimony was that "some processing was going on in these tanks", but no manufacturing. The court below in its opinion said: "While both [witnesses Edgley and Malisoff] have been helpful, we lean to the view as expressed by Mr. Malisoff, expert witness called by the city, from whom we received a better understanding of the trade in which the appellant is engaged, and as to the trade understanding of the words 'machinery' and 'tools' when considered in relation to the tanks in question."

Professor Malisoff's testimony that "most of the tanks are essentially storage tanks" and that while "some processing was going on in these tanks, a process is not a machine" and therefore that the tanks were not ma-

chinery, was not within the legitimate range of expert testimony. Professor Malisoff was competent as a chemical engineer to testify as to the construction of the tanks and to the chemical and physical actions involved in the oil refining which took place in those tanks. Whether what took place in those tanks was or was not manufacturing and whether or not the tanks were a part of the machinery of oil refining, was a question for the tribunal trying the issue.

In *Corning v. Burden,* supra, the U. S. Supreme Court held that the *opinion* of an expert witness as to whether the thing for which a patent was issued was a process or a machine, was properly rejected. Wigmore on Evidence, Third Edition, Vol. II, section 557 states: "There is a rule of Evidence (post section 1918) which excludes, on the ground of superfluity, testimony which speaks to the jury on matters for which all the materials for judgment are already before the jury [or other tribunal]." Wigmore in Vol. 7, section 1918, quotes with approval the following from the opinion of Justice CAMPBELL in *Evans v. People,* 12 Mich. 35: "It is an elementary rule that, where the Court or jury can make their own deductions, they shall not be made by those testifying." He also quotes the following from Chief Justice NELSON'S opinion in *Lincoln v. R. Co.,* 23 Wend. 432: "Opinions, belief, deductions from facts, and such like, are matters which belong to the jury and by which they arrive at their verdict. When the examination extends to these, and the judgment, belief, and inferences of a witness are inquired into as matters proper for the consideration of a jury, their province is in a measure usurped; the judgment of witnesses is substituted for that of the jury." In *Cornell v. Green,* 10 S. & R. 16, Justice GIBSON said: "A witness is . . . to state the facts . . . and thus leave the jury to draw their own conclusions." See *Coyle v. Commonwealth,* 104 Pa. 117; and *Cooper v. Metropolitan Life Ins. Co.,* 323 Pa. 295, 186

A. 125. When in the case now before us the experts agreed as to what takes place in these tanks, i. e., as to their functions, it became the duty of the court to make the correct deductions from the facts so established. Dr. Malisoff, as a professor of bio-chemistry, was competent to testify as to what processes took place in these tanks, and when he said: "And the question at issue, it seems to me, is what is going on within that tank . . ." he correctly stated the question for him to answer, but when he added: "Is there a manufacturing going on?" he stated the question which the *tribunal* and *not he* was called upon to answer. With all the facts before it, the tribunal was as competent as he was to answer that question, and it was its duty to do so without "expert" assistance in reaching its conclusion.[3]

Our decision that the tanks in question are machinery within the meaning of the Act of 1915, supra, is in accord with the accepted definitions of the word machinery and in accord with the decisions in similar cases in other jurisdictions. Bouvier's Law Dictionary, Rawle's New Edition, Vol. 2, p. 288, says of "machinery" that it is "A more comprehensive term than machine, including the appurtenances necessary to the working of a machine; . . . also a combination of mechanical means to a given end, such as the machinery of a locomotive

---

[3] If the question at issue was whether or not the making of maple sugar was manufacturing and whether or not the pails and evaporating pans used in the making of sugar were machinery, an expert could testify as to the functions of the pails in temporarily "storing" or holding the sap and the function of the evaporating pans in "processing" the sap into maple sugar but he would be usurping the functions of the tribunal if he offered his "conclusion" that the pails and pans were not a part of the machinery of maple sugar making. Likewise, an expert witness could testify as to the functions of the well-seasoned sherry casks which formerly contained spirit and which are used for the "storing" of whiskey for its "maturation", but his opinion as to whether or not the sherry storage casks constituted a part of the machinery of whiskey manufacturing could not be received.

or of a canal lock, or of a watch." It also says, quoting from 161 U. S. 316, 325, "The mains or pipes laid in streets to distribute gas are 'part of the machinery by means of which the corporate business (is) carried on.' " In *Tubbs v. Mechanics' Ins. Co.*, 108 N. W. 324, 326, the Supreme Court of Iowa held: "The objection which is specifically urged to the court's enumeration of the machinery is that the boiler, pipes, and fittings have no proper place in that category, because, it is said, 'they did not convey or regulate force. They did not contribute in the remotest degree to keep any kind of machine or appliances in action or motion.' Among the definitions given by Webster's International Dictionary we find the following: 'Machine—any mechanical contrivance.' 'Machinery—the means and applicances by which anything is kept in action or a desired result is obtained; a complete system of parts adapted to a purpose.' . . . In the laundry we have the same combination of boiler and engine or other mechanism by which a desired result is obtained, and the fact that the boiler is not mounted on wheels or that union between the boiler and other mechanism is effected through a greater length of pipe makes the entire apparatus none the less a single system of machinery."

In *Leonhard Michel Brewing Co. v. Cantor et al., Com'rs. of Taxes and Assessment,* 198 N. Y. S. 284, the question was whether or not machinery used for the manufacture of ice and beer was personal property within the meaning of the tax law. It was held by the Supreme Court of Kings County that all of the equipment used in the manufacture of ice and beer was machinery and was personal property. It was stated that "a portion of the machinery . . . is of very large dimensions, such as the compressors and various tanks . . ."

In *Commonwealth v. Lowell Gas Light Co.,* 94 Mass. 75, the Supreme Judicial Court of Massachusetts held that the mains and pipes used by the gas company

for distributing gas throughout the state were "a part of the apparatus necessary to be used by the corporation in order to accomplish the object for which it was established. They constituted a part of the machinery by means of which the corporate business was carried on, in the same manner as pipes attached to a pump or fire engine for the distribution of water, or wheels in a mill which communicate motion to looms and spindles, or the pipes attached to a steam-engine to convey and distribute heat and steam for manufacturing purposes, make a portion of the machinery of the mill in which they are used. Indeed, in a broad, comprehensive and legitimate sense, the entire apparatus by which gas is manufactured and distributed for consumption throughout a city or town constitutes one great integral machine, consisting of retorts, station-meters, gas-holders, street-mains, service-pipes and consumers' meters, all connected and operating together, by means of which the initial, intermediate and final processes are carried on, from its generation in the retort to its delivery for the use of the consumers. No satisfactory reason has been suggested by the attorney general for excluding any part of the value of this apparatus from the deduction which the tax commissioners are required to make for the machinery of the corporation properly taxable in the city where it is established, and we have been unable to see any plausible ground for refusing to make such deduction."

In *Worden-Allen Co. v. City of Milwaukee*, 171 Wis. 124, 176 N. W. 877, it was held that a sewer is machinery within the statute which gives a material-man a lien for material used in the construction, repair, or removal of any building or machinery. The Wisconsin Supreme Court said: "The plaintiff contends that the sewer is machinery within the meaning of that term as used in Section 3328. That it is not a machine is clear. That the sewerage system of

the city of Milwaukee is a part of its machinery is established by the authorities. The word 'machinery' is of a much broader application and much more comprehensive in its meaning than the word 'machine' ".

The Circuit Court of Appeals in *National Enameling and Stamping Co. v. Zirkovics,* 251 Fed. 184, in holding a kettle, in which certain metals were melted by the use of fire under and around it, machinery declared: "Whether the kettle by itself, unconnected with any other machinery, would fall within the meaning of the statute, it is not necessary to determine in this case, as the evidence establishes the following facts: The kettle was in a large room, where sheets of iron were galvanized. To perform this work a large machine, consisting of many parts, was used. There was a space surrounded by four brick walls, within which was the iron kettle. There was a space between the walls and the kettle, where charcoal was placed for the purpose of heating the kettle and melting the zinc placed in it. Over the kettle, and forming a part of the galvanizing machine, were rollers, shafts, runways, belts, and other machinery, some of which extended into the pot. From this description we are of the opinion that the melting pot was a part of the machinery used for the purpose of galvanizing sheet iron . . ."

When tested by the canons of interpretation laid down by the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS, 552, our conclusions are confirmed. Article 4, section 52, of the Act says: "In ascertaining the intention of the Legislature in the enactment of a law, the courts may be guided by the following presumptions among others: (1) That the Legislature does not intend a result that is absurd, impossible of execution or unreasonable."

If we held that any manufacturing company's apparatus which does not "apply force or involve the quality of motion" or in which the major action is chemical,

is *not* machinery within the meaning of the Act of June 3, 1915, P. L. 787, 53 PS, 4742, the result would be "absurd", and if not "impossible of execution" it would at least be *impracticable* of execution by those whose duty it is to determine what parts of the machinery of any manufactory are exempt from local real estate taxation under the Act of 1915. If for purposes of taxation *static* machinery must be separated from machinery that *moves,* it would be necessary, for example, in assessing butter manufactories to separate the blades which beat the cream, from the barrel which contains it.

Article IV, section 51, of the Statutory Construction Act states that "the intention of the Legislature may be ascertained by considering, among other matters—(1) ; (2) ; (3) ; (4) the object to be attained." The "object" of the Act of 1915 was to attract to this state manufactories[4] and to retain those whose owners might be tempted to move them to states with more liberal tax policies. Giving the word "machinery" the construction we have given it promotes the above object.

In the appeal indexed to No. 139, January Term, 1946, and the appeal indexed to No. 140, January Term, 1946, the decrees of the court below are reversed and in each case it is ordered that the tanks whose assessment is in controversy and which are more fully described in the appeals now being decided, be declared "machinery and tools used in manufacturing" and *as such excluded* from real estate assessed for. taxation, in obedience to the prescriptions of the Act of June 3, 1915, P. L. 787, 53 PS, 4742; costs to be paid by the appellee.

Mr. Justice DREW and Mr. Justice JONES dissent.

---

[4] In the value of its manufactured products, Pennsylvania ranks second among the States of the Union. The latest figures given by the World Almanac for 1947 with respect to American manufactured products is 1939. In that year the value of manufactured products in Pennsylvania was $5,473,317,408 and the wages paid to workers in Pennsylvania manufactories in that year was $1,003,347,730.