## Safe Harbor Power Corporation

*Bernard M. Zimmerman of Zimmerman & Going* and *Leonard M. Saari,* for appellant.

*Carl G. Herr,* for appellee.

BROWN, J., March 30, 1972.—Appellant in this case, Safe Harbor Corporation (Safe Harbor), is a public utility as defined by the Public Utility Realty Tax Act of March 10, 1970, No. 66, 72 PS §3271-3278 (PURTA), Safe Habor owns and operates a hydro-electric generating facility on and along the Susquehanna River in Lancaster County pursuant to a Federal power project license granted by the Federal Power Commission.

Following the provisions of PURTA, the Board of Assessment Appeals of Lancaster County (board) arranged for the assessment of Safe Habor's utility realty as defined by the act. Safe Harbor objected to

the board's assessment as being excessive and arbitrary by written appeal to the board and by a board hearing. As a result of this hearing a substantial reduction in Safe Harbor's assessment was made by the board.

Safe Harbor in its present appeal bases its contention on three grounds, that the assessment was excessive, improper and unjust because it was arbitrary in that it was improperly based on estimated reproduction cost, trended to 1960 values, and disregarded that which amounts to legal restrictions imposed on the property by Federal law, and that it was not supported by a prima facie showing of fair value which it claims it rebutted by evidence introduced at the court hearing. Safe Harbor further claims that the assessment improperly included property which by law is not assessable as utility realty under PURTA or under general real estate assessment law, such as its dam. Finally, it contends that the properly assessable utility realty was appraised at a figure far in excess of fair market value, which in the case of Safe Harbor's power project property subject to a Federal license cannot exceed original cost less depreciation, and in the case of property subject to State regulation is fairly established at original cost less depreciation.

The court will first consider the inclusion of the dam of Safe Harbor which is included in the assessment, and whether or not the language of PURTA in section 3272 under definition (c), excluding certain items from assessment, excludes the dam as assessable property of Safe Harbor. This dam was constructed in 1931 and is part solid masonry and part reinforced masonry, is 42 feet wide or thick, 62 feet high and extends across the Susquehanna River for a distance of about 6,900 feet. The dam backs up

the river water for a number of miles and forms large lakes or reservoirs and runs it through certain portions of the dam where the generating machinery is located. Lancaster County is situated on the eastern side of the Susquehanna River but the county's western boundary line is the low water mark on the west (or York County) side of the river. The dam in question is thus situated in Lancaster County.

Under section 5 of PURTA, the board is directed to arrange for the assessment and valuation of all utility realty in the same manner as provided by law for the assessment and valuation of other real estate.

PURTA, as above. stated, in section 3272(c)(iii) defines "utility realty" as *excluding machinery and equipment:* 72 PS §3272(c). This is consistent with general Pennsylvania real estate assessment law. Under section 201 of the General County Assessment Law, "assessable real estate" is defined to *exclude* "machinery, tools, appliances and other equipment": Act of May 22, 1933, P.L. 853, as amended, art. II, sec. 201, 72 PS §5020-201. It is necessary to look to general realty assessment law to determine what is meant in PURTA by the exclusion of machinery and equipment. (Italics supplied.)

Under a substantial line of leading Pennsylvania decisions, the term "machinery and equipment" for purposes of the exclusion from tax assessment, has been held to include all improvements to real estate, whether fast (attached to the land) or loose, which: (1) are used directly in manufacturing the products that the establishment is intended to produce; (2) are necessary and integral parts of the manufacturing process; and (3) are used solely for effectuating that purpose. See United States Steel Corporation v. Board of Assessment and Revision of Taxes, 422 Pa. 463 (1966); Jones & Laughlin Tax Assessment

Case, 405 Pa. 421 (1961); Gulf Oil Corporation v. Philadelphia, 357 Pa. 101 (1947). Safe Harbor's dam fits that category. It is used directly in producing hydroelectric power; it is a necessary and integral part of the process of producing hydroelectric power and it was constructed and is used by Safe Harbor solely to effectuate the purpose of producing hydroelectric power. (The dam is not *used by Safe Harbor* for any other purpose, such as to provide irrigation or recreation for profit, although as an incidental use certain recreation facilities are made available without profit to the public pursuant to FPC regulation.)

The dam falls into the category of machinery and equipment, exempt from assessment as real estate, despite the fact that it is attached to the land. In Pennsylvania, the test for machinery and equipment for tax assessment purposes is not whether the object moves or whether it is physically attached to the land, but the test is whether the object is an integral part of a manufactory or a mill, whether it is an essential part of a process without which the process or operations would be impossible: Gulf Oil Corporation v. Philadelphia, supra, at pages 102-19; Jones & Laughlin Tax Assessment Case, supra, at pages 427-29. The dam falls into this category as have other similar objects in the past.

In the Gulf Oil case, supra, the Pennsylvania Supreme Court overruled the ancient theory that no structure can be considered machinery if it does not apply physical force or involve motion. The modern age, stated that court, has outgrown that concept for much of machinery today has only passive or motionless functions to perform. The court rules that processing and storage tanks were considered machinery and equipment: Gulf Oil, supra, at page

109. In the Jones & Laughlin case, supra, all items necessary in the manufacturing process were called machinery, *as well as the foundations and structures* directly related to such machinery and equipment. Foundations supporting and structures enclosing the equipment were excluded pursuant to the machinery and equipment exclusion. The reason, as stated by the Supreme Court, is that the foundations and structures are vital and necessary to operation of the machinery, they constitute an integral part thereof and added nothing to the value of the real estate, regardless of the fact that the structures and foundations were permanently affixed to the land: Jones & Laughlin, supra, page 427.

As stated by Safe Harbor's witnesses, the exclusive purpose and use of the concrete dam structure is to impound water at sufficient height and expanse as to supply power to the hydroelectric rotors and generators. Without the dam, no head of water exists and no electricity can be generated. The entire dam is necessary and essential for the production of electricity: Indeed, the very heart of the power project is the dam, without which no power project would be possible.

This specific principle was so decided in a New Jersey case under a former New Jersey statute similar to PURTA. In Eastern Pennsylvania Power Co. v. State Board of Taxes and Assessment, 100 N.J.L. 255, 126 Atl. 216 (1924), a utility owned a concrete dam across a stream which was used to produce hydroelectric power. New Jersey law, P.L. 1919, p. 49, provided that payment of the tax on gross receipts by a utility exempted the utility from local realty tax on "machinery, apparatus, (and) equipment." In the Eastern Pennsylvania Case, the utility company stated that since it paid the gross receipts

tax, its concrete dam should not be assessed for local real estate tax because it was in the machinery and equipment category. The New Jersey court upheld the utility's claim, stating that since the dam was used to impound water to furnish power for an electric generator, the dam was considered machinery and equipment and should not be assessed. The court reasoned that the concrete dam was just as necessary and essential for the production of electricity as were the water wheel and generator. Although the land underneath the dam was assessable as realty, the concrete dam itself was exempt as machinery and equipment. The same reasoning is equally applicable in Safe Harbor's situation.

The reasoning of the New Jersey case, when taken together with long-established Pennsylvania law on the question of what constitutes machinery and equipment for purposes of realty tax assessment, presents a compelling basis for the finding that as a matter of law hydroelectric dams should not be assessable as utility realty under PURTA.

The result of such a conclusion does not represent a substantial harmful precedent with respect to assessable realty in Lancaster County. It does not decide the question of taxability of dams, generally, such as farm or irrigation dams. The conclusion merely affects the narrow area of hydroelectric dams under PURTA. It merely states that hydroelectric dams used to produce electricity are not assessable as utility real estate under PURTA because they are considered so essential to hydroelectric production as to be considered nonassessable machinery and equipment. This conclusion is based on general Pennsylvania law applicable to real estate assessments, and is based on the very wording of PURTA.

In its brief and oral argument, the board, while

conceding under the old section 201 of the General County Assessment Law (72 PS §5020-201), that machinery, tools, appliances and other equipment contained in any mill, mine, manufactory or industrial establishment shall not be considered or included as a part of the real estate in determining the value of such mill, mine, manufactory or industrial establishment, and further, under the authority of Jones & Laughlin Tax Assessment Case, supra, that the dam in this case would not be assessable, contends further that PURTA changed the law with respect to machinery, equipment, or, in this case, a dam. Board then continued to argue that a mere reading of section 2(c) of PURTA, 72 PS §3272(c), shows an intent to tax items used in the furnishing, including producing, storing, distributing or transporting of public utility service as in this case, electricity, and therefore contends that the earlier cases on this problem are not relevant to PURTA. However, the language in PURTA in excluding machinery and equipment, in this court's opinion, is following the original concept of the amended Act of 1953 on defining how county assessments should be made and that by the inclusion of the words "machinery and equipment" the principles laid down in Jones & Laughlin Tax Assessment case, supra, still prevail. If PURTA, as counsel for the board argues, is read as though governed by Jones & Laughlin Tax Assessment case and Gulf Oil Company v. Philadelphia, supra, then truly the legislature has engaged in an utterly futile exercise in passing the act and all public utilities would be held to own only machinery and equipment and nothing should be taxable under the act. The court does not adopt this reasoning. If the legislature in PURTA intended to change the law with regard to machinery and equipment, well know-

ing that this language appeared in the prior exempting acts covered by the Jones & Laughlin Tax Assessment Case and Gulf Oil Company v. Philadelphia decisions, it should have spelled out his change in more specific language. To illustrate in concluding this part of the opinion, section 201 of the General County Assessment Law as amended, (72 PS §5020-201) specifically provides:

". . . Machinery, tools, appliances and other equipment contained in any mill, mine, manufactory or industrial establishment shall not be considered or included as a part of the real estate in determining the value of such mill, mine, manufactory or industrial establishment: . . ."

Likewise in PURTA the act states it shall not include, (c)(iii), "machinery, equipment, pole, transmission tower, pipe, rail or other lines, whether or not attached to such lands, buildings, towers, smokestacks or other structures."

This conclusion is all the more apparent when we see that PURTA in section (c), supra, begins by defining utility realty as "lands, buildings, towers, smokestacks and other structures, located within this commonwealth and owned by a public utility . . . which are used or are in the course of development or construction for use in the furnishing, including producing, storing, distributing, or transporting of public utility service," then follows this language in this same section by exempting "machinery, equipment. . . ." The similarity of this language in both the General County Assessment Law and PURTA constrains the court to determine that a dam which would have been excluded and was excluded under the General County Assessment Law is likewise excluded in PURTA.

In addition to the foregoing, under the provisions of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §501, et seq., we find in section 551 thereof "when the words of the law are not explicit, the intention of the Legislature may be ascertained by considering among other matters— . . . (5) the former law, if any, including other laws upon the same or similar subjects." Further, we find in section 562 of the said Statutory Construction Act the following:

"Laws or parts of laws are in pari materia when they relate to the same persons or things or to the same class of persons or things.

"Laws in pari materia shall be construed together, if possible, as one law."

The court, therefore, will reduce the assessment of Safe Harbor by excluding the dam of Safe Harbor therefrom in the concluding paragraph of this opinion after discussing the other issues raised in this appeal.

We next consider whether the board properly evaluated the property of Safe Harbor and, in doing so, whether it was required to consider the so-called legal restrictions imposed on it by Federal law.

The County of Lancaster for a period in excess of 10 years has been engaging the services of Cole-Layer-Trumble, a professional appraisal firm specializing in real estate valuations for tax purposes, for the purpose of valuing its real estate for tax purposes. This company has had considerable experience in many Pennsylvania counties, and in many portions of the United States. Its expert appraiser in valuing industrial establishments in this multi-State area, Richard B. Drzewiecki, testified at length in this case on the manner in which he valued the utility realty here involved, including the dam in question. He testified that in the recent past, he has appraised and valued public utility

properties in many portions of this and neighboring States. He valued Safe Harbor's utility realty at a total value of $13,157,500, and the board fixed its assessment at the established ratio of 25 percent for an assessed value of $3,289,370.

Safe Harbor here objects to the board's method of valuation, claiming that it was based on present-day reproduction costs, trended to 1960, and adjusted for depreciation.

PURTA provides in section 5 that the Board of Assessment Appeals shall "assess and value all utility realty in the same manner as is provided by law for the assessment and valuation of real estate." Lancaster County is subject to the Third Class County Assessment Law of June 26, 1931, P.L. 1379, 72 PS §5344, et seq. relating to assessment procedures, and that act requires that assessments be based on "actual value." Actual value means market value. Market value is the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied. See United States Steel Corporation v. Board of Assessment and Revision of Taxes, 422 Pa. 463 (1966). In Traylor v. Allentown, 378 Pa. 489 (1954), the following appears:

"Among the factors to be taken into account and given appropriate consideration, both severally and in combination, as respects the actual value of a particular property are 'the character of the work done and materials furnished in the construction of the building; its present condition of repair or disrepair; the wisdom or unwisdom of its location for [its intended use]; its modernity and adaptability for that purpose; the likelihood of competition with other and better buildings;

and whether the property itself, and the neighborhood in which it is situated, are likely to increase or decrease in value:' . . ."

The actual or market value, while not easily ascertained, is fixed by the opinions of competent witnesses as to what property is worth on the market at a fair sale; and many factors should be taken into account by the expert witness in arriving at his estimate of such value: Baldwin-Lima-Hamilton Corp. Appeal, 412 Pa. 299 (1963). It is proper to study those elements of intrinsic value which a prudent purchaser would take into consideration, the return it will yield, the state of the market, the cost of production, the physical features of the property, the highest and best use thereof. See Lehigh Navigation Coal Co.'s Appeal, 327 Pa. 327 (1937). The assessed value must be determined by taking into consideration all of these elements which give it a market value. Cost value is not as a rule a proper measure of market value. See Pennsylvania Stave Company's Appeal, 236 Pa. 97 (1912). A sale price is only an element of some weight in determining value for assessment purposes. See Matson's Appeal, 152 Pa. Superior Ct. 424 (1943). Reproduction cost less depreciation will not substantiate a determination of actual value if it is the only, or a major, basis for the determition. See Baldwin-Lima-Hamilton Corporation Appeal, supra.

In this case, the testimony shows, and both sides agree, that there have been no sales of public utilities, and no rentals thereof, known to either party anywhere in the United States at any time. There are, therefore, no comparable sales or rentals on which to attempt to base market value for the utility realty here involved, as there are in the normal tax assessment cases. In such circumstances, as the court stated, ". . . This is

a different type of real estate than we normally have before the court for valuation, so there must be some latitude allowed here."

It cannot be denied that board's witness, Mr. Drzewiecki, used reproduction cost, less depreciation, as one of the elements in fixing the actual or market value of the public utility realty here involved. Under the cases cited above, the valuation cannot stand if that were the only consideration used in determining value. But let us look at the record. The witness has considerable professional experience and he demonstrated that he knew the meaning and definition of the terms "actual value" and "market value" as established by the courts. He considered the highest and best use of the realty, the actual costs of the projects as given to him by the companies themselves, familiarized himself with the upward or downward trend of such costs to the present date, studied the types of structures involved, the dates of the construction, physical and functional depreciation which should be applied to the actual construction, economic depreciation that should be considered, the state of repair and disrepair, the trend of sales of industrial complexes in Pennsylvania over the years, the type of structures that would be built today to replace the actual structures, the effect of the utility realty on neighboring real estate, possible alternative uses of the properties, emphasizing present use, the surrounding topography, studying nationwide costs and sales indexes, and, on the basis of all of these considerations, gave his opinion of the market value of the utility realty. It cannot be said that any one of such considerations was a dominant feature in arriving at his opinion. The court determines that, lacking comparable sales and rental data, Mr. Drzewiecki considered every element that a purchaser would or could consider in coming to an opinion of

market value. The witness made his prima facie case concerning the market value of the utility realty, that prima facie case was properly established and that prima facie case of value stands unless Safe Harbor establishes a different value by competent evidence of their own.

The preceding portion of this opinion reviews the requirements for determining market value of realty. Reference is again made to Pennsylvania Stave Company's Appeal, supra, where it was held that cost value is not a proper measure of market value. It is perhaps a consideration, but the older such cost is the less consideration should be given it. Cost value alone is as objectionable to the determination of market value as is reproduction cost less depreciation alone.

Safe Harbor here contends that its book value of the utility real estate, the cost thereof less depreciation taken to date, is the only proper determination of the market value of its real estate, because the Federal Power Commission licenses provide that upon expiration of the 50-year license periods, the Federal government has the right to take over the facilities at such book value. It also states that if the utilities were sold to another utility, with the government's approval, the purchaser would have to assume the seller's book value for rate-fixing purposes and write off any excess paid, which means that, in fact, the facilities cannot be sold. Safe Harbor's own witness testified that he knows of no public utility in the United States which has been taken over by the Federal government upon the expiration of a license like the ones here involved.

In further answer to Safe Harbor's contentions, it cannot be accepted that the utility realty would have no market value if the company's book value were reduced to zero. Further, it is noted again that PURTA provides that the board is charged with valuing and

assessing utility realty under the act "in the same manner as is provided by law for the assessment and valuation of real estate." If, as Safe Harbor claims, utility realty cannot be assessed except at book value, there would be no meaning to the act's provision above quoted, and the legislature again merely went through a futile exercise in including the provision.

Attention is drawn to two definitions used in PURTA. "State taxable value," (72 PS §3272(d)), is the book value, on the utility's books, of utility realty; this is the value upon which the utility pays the base tax to the State. "Realty tax equivalent," (72 PS §3272(f)), means the total amount of taxes which a local taxing authority could have imposed on utility realty but for this act, and shall be the product of the real estate property, tax rate and the assessed valuation of utility realty. Here again, if the legislature meant that "the assessed valuation of utility realty" is the same as "State taxable value," it could and would have said so, and there would have been no need to bring the board into the picture.

We, therefore, conclude that the board's evaluation of Safe Harbor's utility property was proper and even though it used reproduction costs less depreciation as one of the factors involved, we find that, disregarding this factor, the other elements heretofore cited justified and rendered fair the valuation of the Safe Harbor property.

In accordance with the foregoing language of this opinion, the court must sustain, in part, the appeal of Safe Harbor from the tax assessment of its real property in Manor Township and will delete the dam valuation from the board's tax assessment of Safe Harbor's utility realty.

And now, March 30, 1972, the court, for the foregoing reasons, sustains, in part, the appeal of Safe Har-

bor Power Corporation from the tax assessment of its real property in Manor Township and fixes the assessment as follows: Land, $6,370; improvements without dam, $1,535,800; total $1,542,175, which is one-fourth of the appraised value of the utility realty of Safe Harbor Power Corporation.