## School District of Falls Township Appeal

*T. Sidney Cadwallader, II, Esq.*, for School District.
*Samuel M. Snipes, Esq.*, for Falls Township.

*Samuel S. Gray, Jr., Esq.*, for Board of Assessment.
*George T. Kelton, Esq.*, for U. S. Steel Corporation.

SATTERTHWAITE, J., March 23, 1962.—These are consolidated appeals by the Township of Falls and the school district of said township from the real estate tax assessments of the Fairless Works of the United States Steel Corporation for the years 1957, 1958 and 1959. The steel company has intervened and actively opposes the appeals. After unduly protracted discovery proceedings, and ultimately a pretrial conference for the purpose of narrowing the issues and providing some guide as to the scope of inquiry on the valuation problems, the court entered an interlocutory order on September 22, 1960, directing, inter alia, the making of a preliminary record pertaining solely to the determination of the proper subjects and objects which should be valued and assessed for the years in question. The single issue before the court at this time, arising on a record consisting of an elaborate and detailed stipulation of counsel implementing this intermediate order, is the matter of inclusion or exclusion of certain particularly specified (but not all) facilities of the subject plant. No problems of valuation, uniformity or kindred issues which may pertain to other facets of the ultimate merits of the appeals are now to be considered. Although the questions so defined were argued before the court several months ago, disposition has been deferred pending the determination by the Supreme Court of litigation from Beaver County involving somewhat similar problems. Since the decision of the latter case, Jones and Laughlin Tax Assessment Case, 405 Pa. 421, on December 5, 1961, the matter has been reargued in light of this latest precedent.

The controlling statutory provision is section 201 of the Fourth to Eighth Class County Assessment Law of May 21, 1943, P. L. 571, as amended, 72 PS

§5453.201. Before amendment in 1953, this section provided in relevant part as follows:

"The following subjects and property shall as hereinafter provided be valued and assessed and subject to taxation for all county, borough, town, township, school, (except in cities), poor and county institution district purposes, at the annual rate,

(a) All real estate, to wit: Houses, buildings, lands, lots of ground and ground rents, mills and manufactories of all kinds, and all other real estate not exempt by law from taxation. . . ."

Prior to 1953, it was well established that the narrow question presently before the court should be resolved by the application of the so-called "assembled industrial plant doctrine." This principle, enunciated in Voorhis v. Freeman, 2 W. & S. 116, was restated in several cases, including the following from the opinion of Titus v. Poland Coal Co., 275 Pa. 431, 436-437:

". . . The Pennsylvania rule is that a chattel placed in an industrial establishment for permanent use, and necessary to the operation of the plant, becomes a fixture and as such a part of the real estate although not physically attached thereto; in other words, if the article, whether fast or loose, be indispensable in carrying on the specific business, it becomes a part of the realty: [citing cases and texts] . . . Whatever is a necessary part of the machinery for carrying on the business is a fixture irrespective of the manner of its attachment: . . ."

See also Commonwealth Trust Company of Pittsburgh v. Harkins, 312 Pa. 402; Central Lithograph Company v. Eatmor Chocolate Company (No. 1), 316 Pa. 300; Roos v. Fairy Silk Mills, 334 Pa. 305; McClure v. Atlantic Rock Co., Inc., 339 Pa. 296; Continental Bank & Trust Company of New York v. American Assembling Machine Company, Inc., 350 Pa. 300; First National Bank of Mount Carmel v. Reichneder, 371

Pa. 463; The Clarkson Laboratories, Inc. v. Roadway Excavation Corporation, Inc., 6 Bucks 145.

The "assembled industrial plant doctrine" so applied in the foregoing cases to determine property rights and preferences between creditors, was held equally applicable and controlling in resolving disputed subjects of real estate tax assessments under ancestor legislation similar to section 201 of the original provisions of the Fourth to Eighth Class County Assessment Law of 1943 above quoted: Patterson v. Delaware County, 70 Pa. 381; Pennsylvania Stave Company's Appeal, 236 Pa. 97; Mesta Machine Company Case, 347 Pa. 191 (reversed, sub nom. United States v. Allegheny County, 322 U. S. 174, solely on federal supremacy grounds) ; Defense Plant Corporation Tax Assessment Case, 350 Pa. 520 (affirmed, sub. nom. Reconstruction Finance Corporation v. Beaver County, 328 U. S. 204) ; Moeller v. Washington County, 352 Pa. 640, Homestead Borough v. Defense Plant Corporation, 356 Pa. 500; United Laundries, Inc. v. Board of Property Assessment, Appeals and Review, 359 Pa. 195; North Side Laundry Company v. Allegheny County Board of Property Assessment, Appeals and Review, 366 Pa. 636; Bemis v. Shipe, 26 Pa. Superior Ct. 42; Guthrie v. Pittsburgh Dry Goods Company, 47 Pa. Superior Ct. 384; Messenger Publishing Company v. Allegheny County Board of Property Assessment, Appeals and Review, 183 Pa. Superior Ct. 407. As an illustration of how far this doctrine was extended so as to include even a motor vehicle in the form of a lift truck, see Appeal of Van Ormer Brick Co., 100 Pitts. L. J. 351.

The impact of the doctrine enunciated in these cases insofar as it pertained to the assessment for real estate tax purposes of industrial establishments, however, was radically modified by the Act of July 17, 1953, P. L. 455 (effective, under the Act of July 28, 1953, P. L. 703, only as to tax years beginning on or after January

1, 1956). This amendment added the following language to sub-section (a) of section 201 above quoted:

"Machinery, tools, appliances and other equipment contained in any mill, mine, manufactory or industrial establishment shall not be considered or included as a part of the real estate in determining the value of such mill, mine, manufactory or industrial establishment."

(See also the Act of July 17, 1953, P. L. 454, adding an identical clause to the corresponding provision of the General County Assessment Law.)

The interpretation and application of the 1953 amendment (as well as the constitutionality thereof, a subject not raised in the instant proceeding) constituted the matters before the court in Jones and Laughlin Tax Assessment Case, 405 Pa. 421, supra, and the principles enunciated in the opinion of the court therein must be evaluated and applied to the facts disclosed in the present record. There, as here, the controversy pertained to the exclusion of particular facilities of an integrated steel plant. There, as here, the principal point of discussion was the effect of the 1953 legislation on the "assembled industrial plant doctrine" as applied in tax assessment cases. There, as here, the protesting municipalities contended that the legislature intended to modify the "assembled industrial plant doctrine" only to the extent of withdrawing movables from the effect thereof, and that it did not intend to exempt from real estate taxation permanent improvements to the land, that is, things so affixed that they could not be removed without material damage to the land itself. The Supreme Court rejected this contention, reiterated the earlier well-established repudiation of the common law doctrine of fixtures as the criterion in this aspect of tax assessment controversies, and approved the practice of the assessor in excluding from the real estate category all items, whether or not physically affixed, which were directly necessary in the man-

ufacturing process and used solely therefor, as well as the foundations and structures which were essential and integral parts of such equipment and facilities.

After discussing certain precedents and pointing out the apparent policy of the legislature to encourage industrial progress and employment within the Commonwealth of Pennsylvania, the court enunciated the following rule of general application in construction of the 1953 amendment, at pages 431-432:

"Therefore, it is our considered conclusion, under the statute involved, improvements, whether fast or loose, which are used *directly* in manufacturing the products that the establishment is intended to produce and are necessary and integral parts of the manufacturing process and are used *solely* for effectuating that purpose, are excluded from real estate assessment and taxation. On the other hand, improvements which benefit the land generally and which may serve various users of the land, are not in this category. Neither are structures, which are not necessary and integral parts of the manufacturing process and which are separate and apart therefrom, within the exclusion. A structure used for storage, for example, is part of the realty and subject to real estate taxation."

Moreover, this decision definitely rejected the contention made by appellants herein, that the statute in question provides for an *exemption* from taxation and should be strictly construed against the taxpayer. In fact, the Supreme Court held to the contrary that it prescribes a reasonably classified and therefore constitutional *exclusion:* 405 Pa. at 433. Hence, its application presents a problem of selective *imposition* of tax and, as such, is subject to the usual principle of strict construction of tax statutes with all reasonable doubts resolved in favor of the taxpayer: Loeb Estate, 400 Pa. 368, 372 and cases cited:

Still further, the Jones and Laughlin case held that the legislature had established in the 1953 amendment an even less rigorous standard for the exclusion of "machinery, tools, appliances and other equipment *contained in* any mill" than had been imposed by the Act of June 3, 1915, P. L. 787, 53 PS §15976, (relating to first class cities) which had excluded "machinery and tools *used in manufacturing* in any mill." (Italics supplied.)

The opinion pointed out that the latter language had been construed in Gulf Oil Corp. v. Philadelphia, 357 Pa. 101, which had determined that the concept of machinery in this sense is not to be confined merely to moving or mechanical objects or appliances but should properly include anything by or through which an integral part of the manufacturing process takes place. With this precedent in contemplation, the legislature must be understood to have intended an even broader exclusion in the 1953 enactment; necessarily an instrumentality, before it can be "used in" manufacturing, must be "contained in" the establishment; the latter language, in the opinion of the Supreme Court, 405 Pa. at 431, was apparently inserted "to avoid the technical question as to what constitutes processing or manufacturing as the Gulf Oil Corporation case presented."

Appellants also argue that the question of inclusion of certain of the particular subjects presently in controversy is no longer open and is controlled beyond further argument by the circumstance that substantially the same particular subjects were in fact included in the assessment considered in the Jones and Laughlin case. Except to the extent that the Supreme Court expresssly referred to two of such items, 405 Pa. at 432, however, we do not accept this contention. We have been furnished with copies of that part of the record of the lower court which was printed on appeal in that case, and have carefully examined the

same in light of this position. We find that, in many instances, that record is insufficiently descriptive to permit any intelligent comparison between the subjects there assessed and those here in controversy. Of even more importance, however, is the unquestioned fact that in the cited case the parties complaining against the assessment in the appeals to both the court of common pleas and the Supreme Court were the affected municipalities, and not the taxpayer. Whether those objects which had been *included* in the assessment were properly so *included* was not before the court; the sole issues which were litigated related to structures and facilities which had been *excluded*, and neither the court below nor the Supreme Court considered the case otherwise. Hence, except to the extent noted, we do not understand the Supreme Court to have held that the mere fact of inclusion of what may or may not be a comparable facility in the Jones and Laughlin case constitutes any judicial precedent compelling or prejudging the *inclusion* of any of the specific subjects of the present litigation.

With these principles in view, we may proceed to an analysis of the controversial items which are before the court in the currently limited phase of the instant case. The stipulation of counsel, which constitutes the entire record on the subject, describes at length by words and photographs 21 classes or categories of plant facilities, the inclusion of which is in dispute. In the interest of convenience of discussion, we shall collect these into various broader groupings or combinations.

The first group consists of what has been referred to in the arguments as site improvements, comprising the following facilities numbered according to the stipulation: no. 3, *Fencing*, made up of perimeter cyclone fence surrounding the outer limits of the entire property, fences enclosing particular items of machinery as personnel protective devices within the plant, and

fences around parking lots; no. 4, *Highway Roads and Bridges*, including pavements and walkways; no. 9, *Personnel Tunnels*, underground re-enforced concrete passageways enabling workmen to move between facilities in safety; and no. 10, *Yard and Roadway Lighting Facilities*, consisting of ordinary street light standards, floodlights on towers, and light fixtures attached to buildings. All facilities in this grouping must be considered as properly included under the Jones and Laughlin decision; they quite obviously are not used directly in the manufacturing process, and they constitute improvements which may fairly be said to benefit the land generally and potentially able to serve various users of the premises. Whether they should be itemized and appraised as the subjects of individual assessments of specified improvements, or merely taken into account as any other aspect entering into the valuation of the whole property, is a problem which we deem unnecessary to decide. All we presently determine under the questions submitted is that they are not within the machinery exclusion of the 1953 amendment, and that they should be "considered or included as a part of the real estate in determining the value of such . . . industrial establishment".

The next grouping would cover those facilities which may be properly characterized as material-handling devices or equipment, together with the supports, foundations and protective coverings necessarily and solely related thereto. Insofar as these items are exclusively, immediately, directly and integrally used for the purpose of assemblage and transportation within the plant of various components, materials, products and by-products in the course of, or necessarily and closely related to, the actual manufacturing processes carried on in the Fairless Works, they are obviously excluded as machinery by the statute, and, under the Jones and Laughlin case, the foundations supporting them as well

as the structures which serve solely as protective enclosures therefor must also be eliminated. On the latter point, see also McClintock & Irvine Company v. Aetna Explosives Company, 260 Pa. 191, 197-198. The following categories enumerated in the stipulation clearly fall within this classification: no. 14, *Conveyor Belt and Supports*, consisting of the drive mechanisms, the belts, the idler rollers, the structural steel supports and foundations therefor, the transfer towers and foundations therefor, and the corrugated siding and roofs atop the supports which protect the machinery and materials from outside contamination; no. 15, *Outdoor Overhead Pipe System and Supports*, consisting of piping for movement of gaseous or liquid components of the manufacturing process, and specifically the systems for coke oven gas distribution, blast furnace gas distribution, steam distribution, oxygen distribution, compressed air distribution and fuel oil distribution; no. 17, *Overhead Crane Rails, Fabricated Steel Plate Crane Girders*, special steel girders and rails, the sole function of which is to provide support and distribute the tremendous weights carried by overhead cranes during the manufacturing process, stipulated to provide no support whatsoever to the buildings within which they are erected; no. 21, *Catwalks and Special Stairways*, facilities affixed to interiors of buildings, the sole function of which is to provide essential access to permit operation of elevated production machinery, such as overhead cranes; no. 2, *Railroad Tracks Embedded in Flooring*, consisting of rails in the Open Hearth Division, the Soaking Pits, the Primary Rolling Division, and the Sheet and Tin Division, used by molten iron carriers, charging buggies, and other types of specialized equipment moving on rails and required by the manufacturing process, as well as by standard railroad cars bringing materials into, and removing the finished or partially finished products from, the immediate places of fabrication.

Ostensibly related to this grouping of material-handling devices and the foundations therefor, but in our opinion distinguishable and not embraced therein, is item no. 16 of the stipulation: *Reinforced Concrete Crane Piers and Structural Steel Columns to Carry Weight of Overhead Cranes.* While, as this heading indicates, the category resembles item no. 17, supra, in that it pertains to the extraordinary quantum of massive load-bearing foundations and supports designed and constructed in contemplation of heavy cranes and similar operating machinery based thereon, nevertheless, it differs from that item in that the machinery-supporting purpose is not the *sole* function. In other words, these foundations and supports are not in themselves obvious and exclusive parts of the excluded machinery as were the facilities of item no. 17, supra. Here, these same structures inseparably perform the further and nonexcluded duty of supporting, and structurally comprising actual parts of, buildings concededly subject to assessment, which house such machinery. While they are considerably more massive and extensive than would be necessary for the latter purpose, we cannot agree that the portion thereof which might arguably be excessive in this connection, and hence attributable to the machinery alone, either practically could, or legally should, be calculated and excluded from the assessor's valuation. Quite obviously the allocation would necessitate skilled and highly technical professional computation of the engineering stresses and other complicated factors of design pertaining to the respective features of these structures, matters not readily determinable by the assessor. Compare the reference to the practicalities of the assessment procedure mentioned by the Supreme Court in Gulf Oil Corp. v. Philadelphia, supra, 357 Pa. at 119. Moreover, these practical difficulties provide a cogent illustration of the occasion and reason for the rationale

of the Supreme Court's general tests in the Jones and Laughlin case for the machinery exclusion under the 1953 statute: that the facility not only be a necessary and integral part of the manufacturing process but also that it be "used *solely* for effectuating that purpose." (Italics by the Supreme Court.) The foundations and supports comprehended by category No. 16 do not in themselves constitute facilities which are peculiarly and exclusively used as direct and integral parts of steel and related processing, nor are they so inseparably identified with items of machinery which do not meet these tests as to be considered component parts thereof, any more than would the general floors and walls of the buildings of which they are a part. Compare City of Louisville ex rel. v. Howard, 306 Ky. 687, 693, 208 S. W. 2d 522, 526. They therefore should not be excluded.

Also properly considered within the material-handling grouping, in part, is item no. 1, *Railway System*. However, special examination and further subdivision of this broad category are required, and not all of the system should be excluded. Of course, the rolling stock is not subject to assessment as real estate under the statute, nor are trackage and the supporting bases therefore where the exclusive purposes and functions are to provide intraplant transportation of the several types of materials and finished or semi-finished products into or out of the various sites of immediate processing or fabrication, such as the tracks illustrated in the photographs of the stipulation numbered 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 1.10, 1.11 and 1.12, which are used, and reasonably can only be used, to move molten iron, burning coke, quenched coke, and other inprocess subjects, both within a given division as well as in and among the several divisions of this integrated steel plant. The trackage excluded under these concepts would comprehend that described in the

last paragraph of page 3 of the stipulation pertaining to handling of inprocess materials, the six subcategories in the blast furnace area described on page 4 and 5 of the stipulation, and the facilities mentioned in the second paragraph on page 5 of the stipulation relating to the transportation of steel ingots from the open hearth to the rolling mill facilities and from there to other divisions.

The machinery exclusion would not extend, however, to through trunk lines connecting with the Pennsylvania and Reading Railroad systems, nor to the conventional freight yard type of railroad facilities on the plant premises proper, consisting of rows of parallel switch tracks, such as those illustrated in photographs numbered 1.13, 1.14 and 1.15, and described in the paragraph on page 3 of the stipulation relating to classification tracks in the Coke Works Area, as well as those mentioned in the description of the Railroad Yard System, with six numbered subparagraphs, on pages 5 and 6 thereof. While it is true that the plant railroad system generally was stipulated to be "an integral and essential part of the material handling facilities, used at the plant in the making of iron, steel, steel products and by-products", nevertheless, the conclusion so expressed does not control the problem under the rationale of the Jones and Laughlin case. These tracks, used for transporting, classifying and distributing inbound materials, the temporary storage of such materials as well as empty cars, and the movement of outgoing products, are not solely or peculiarly usable in the steel industry alone, nor are they directly used for the manufacturing process. Under the circumstances, they are improvements which benefit the land generally and which may serve various users of the premises, whether in the manufacture of steel or for some other purpose.

Parenthetically, we note that both sides argue that Cowanshannock Coal & Coke Co.'s Tax Assessment, 283 Pa. 122, is authority for their respective positions. We doubt that this decision is of any help either way in the instant case. No question of a machinery exclusion was there involved, and consequently the inclusion of the branch railroad of the coal mining property in that case is not a binding precedent in favor of appellants in the instant case; conversely, even though the railroad was there considered "a necessary part of the equipment" of the mine, still the case is not an authority which takes into account the *"solely* necessary" test for exclusion under the 1953 statute as interpreted in the Jones and Laughlin case.

Another grouping or broad basis for classification of the facilities in issue and described in the stipulation would include those characterized as material processing containers, machinery and equipment, such as item no. 6, *Ore Yard;* item no. 7, *Blast Furnace Stock Bins;* item no. 8, *Slag Yard (Slag Pits);* item no. 18, *Ore Screening Station and Sintering Plant;* item no. 19, *Coke Screening Station,* and item no. 20, *Coal Bin Offices and Shops No. F-20.* The first three of these, the Ore Yard, the Blast Furnace Stock Bin and the Slag Yard, appellants, blandly assume to be within the express ruling of the Supreme Court in the Jones and Laughlin case that storage areas are not be to excluded. This position, we believe, disregards and ignores material parts of the stipulation describing these respective facilities and also oversimplifies the legal considerations involved. While there is, of course, an element of storage in the function of each, it is also clear that these structures are peculiarly designed and used directly and, as a practical matter, exclusively, in the course of the manufacturing process of steel and its byproducts.

The Ore Yard, for example, is not only a storage area for iron ore as discharged from the water or rail carriers, but it is also a receptacle used for programmed spreading, layering and blending of the nonuniform shipments of grades of ore received in various cargoes, so as to achieve uniformity for processing in respect to chemical analysis and physical characteristics. The Blast Furnace Stock bins, while having a temporary or "in transit" storage element, really serve as a key part of the function of gathering, combining and mixing of raw materials in the process flow to the furnaces. The Slag Yards, specially designed receptacles into which molten slag is discharged from the blast furnaces, handle a byproduct, not waste, as appellants assume, which is there processed by a controlled and built-in water system for regulated cooling to achieve the required texture, size and physical characteristics before it is removed. In short, these facilities all come within the category of machinery or equipment exclusively necessary to the instant manufacturing processes in the same sense as did the processing tanks, which similarly had storage attributes, of the oil refinery considered by the Supreme Court in Gulf Oil Corp. v. Philadelphia, supra, 357 Pa. 101.

While there is an area of storage involved in each of these last mentioned facilities, and hence it might be thought that the "sole use" test of the Jones and Laughlin case not be met, nevertheless, the latter requirement must be considered in light of the Gulf Oil Corp. case which was cited with approval, and in fact relied upon, in the Jones and Laughlin decision. We believe that the possible semblance of conflict between this aspect of the two opinions is more semantic than real and can readily be resolved by amplification and clarification of the word "solely" in the context of the general rule of the Jones and Laughlin case herein-

above quoted in the earlier part of this opinion. When the Supreme Court in the latter case referred to facilities used directly as necessary and integral parts of the manufacturing process, and added thereto the further requirement that they be "used *solely* for effectuating that purpose", the emphasized word most certainly was intended to connote the idea of exclusiveness in at least two senses: first, to eliminate general purpose items which as subsisting could also reasonably serve other users of the land without major modification, such as, for example, the freight-yard type railroad tracks; and second, to contrast facilities which, whether or not they be peculiar and specially designed structures which might not readily or practically be adaptable by other theoretical occupants, do not in themselves have a direct, necessary and integral part in the actual manufacturing process, such as pure storage structures. We do not agree, however, in view of the Gulf Oil Corp. case, that the word "solely" in this connection has the third connotation implicit in appellants' argument to the effect that a facility, even though not a general purpose item, and in fact integrally, directly and necessarily an essential component of the manufacturing process, nevertheless, should not be within the concept of industrial machinery merely because it also performs additional nonmanufacturing functions.

Items 18 and 19, the Ore Screening Station and Sintering Plant and the Coke Screening Station are essentially machinery in the conventional sense, elevated high in the air on structural steel superstructures, with necessary steel foundations and covered by corrugated siding and roofs in order, in the words of the stipulation, "to protect the machinery and the materials from outside contamination and to contain the product". These, like the conveyor belts and supporting facilities

already discussed, supra, are squarely ruled by the Jones and Laughlin case and must be excluded.

The original position of the intervening Steel Company, to the effect that item no. 20, Coal Bin Offices and Shops No. F-20 should be excluded, we understand has now been abandoned. The structure itself (photograph no. 20.1) is a re-enforced concrete building which is subject to tax as such. It contains not only the storage facilities for coal, but also lower levels containing shops, control rooms and maintenance and foremen's offices. The pure machinery therein, of course, is excluded; the balance of the structure, however, should be included.

The next broad classification or grouping is comprised of the utility systems of the Fairless Plant such as item no. 11, *Water System;* item no. 12, *Sewer System,* and item no. 13, *Power Transmission System.* Here again, further subclassification is necessary; certain parts of these systems should be excluded, and other components, entirely separate and independent thereof, should be included. The *Industrial Water System* (item no. 11A), the *Industrial Waste Sewer System* (item no. 12A), and the *Power Transmission System* (item no. 13) are specially designed facilities, the function and purpose of which are directly, immediately, and practically exclusively to serve as integral and essential elements of the manufacturing process. In general, therefore, these systems are excluded as machinery and equipment under the Jones and Laughlin decision. However, certain structures which constitute parts thereof should be included in the assessment as "buildings", but not the machinery and equipment contained therein: the two cinder block buildings containing the chlorination and switchgear machinery, photograph no. 11.3, paragraph 3 on page 14 of the stipulation; the two-story structural steel

building containing the water treatment plant, photograph 11.6, paragraph 6 on page 14 of the stipulation; the brick control building containing water pumping controls, photograph no. 11.8, paragraph 7 on page 14 of the stipulation; the three cinder block structures containing control equipment for the industrial sewer system, paragraph 4, pages 18 and 19 of the stipulation; the cinder block structure containing controls and switchgear as mentioned in the description of the terminal waste treatment plant, page 19 of the stipulation; the power station building proper, photograph no. 13.1, page 20 of the stipulation.

In connection with the Power Transmission System, the structural steel high tension transmission towers and connecting conductor wires supported by them, as illustrated in photograph 13.4 and also incidentally shown in photographs 1.13 and 10.2, may or may not be included as items of assessment, depending upon their function and purpose; a question not covered by the stipulation. If they merely distribute power generated in the plant to other points exclusively for intraplant industrial use, they should be excluded. On the other hand, if they constitute a supply line to the plant power station from outside sources, as is provided by some means according to the last sentence of the description of this category on page 21 of the stipulation, they would seem to comprise a general purpose facility, like the railroad trunk or connecting line, which would not necessarily be peculiar to this industrial establishment, could well serve various users of the property, and hence would be included under the Jones and Laughlin case.

The *Potable Water System* (item no. 11B), the *Sanitary Sewer System* (item no. 12B) and the *Storm Sewer System* (item no. 12C), by way of contrast to their industrial counterparts, generally do not serve

integral and exclusive functions in the manufacturing process, and concededly may be regarded as improvements which benefit the land generally and might serve other theoretical occupants. These systems as such should accordingly be included. In considering these included categories, of course, items of purely and undisputed conventional, commonly understood and readily removable machinery, such as motors, pumps, mechanical controls, chlorination equipment, and the like, should be regarded as "machinery . . . contained in any . . . industrial establishment", and not subject to assessment; even appellants concede that the machinery exclusion from the "assembled industrial plant doctrine" was intended to eliminate "movables" as objects of real estate for this purpose.

The remaining category of the stipulation is item no. 5, *Waterfront Improvements*. These consist of the vessel slip, with certain other facilities in or upon the eastern reenforced concrete pier wall on the mill side thereof as hereinafter mentioned, and a turning basin, both of which are piered or bulkheaded and artificially dredged deep water arms of the Delaware River, provided for manuevering, docking and unloading of ocean-going iron ore vessels, bringing in scheduled and coordinated shipments of iron and manganese ore from Venezuelan or other ports. These facilities in general we believe properly to be included in the assessment. The transportation function which they serve is not immediately or directly a part of the manufacturing process, and, notwithstanding that these items were stipulated to have been designed as special purpose facilities for the uses mentioned, they do not constitute an exclusive feature of the steel industry since they could readily and reasonably provide substantially similar service for other theoretical occupants of the premises.

No merit is contained in the intervening steel company's argument that these facilities are not taxable in any event because the specific category of "wharves", expressly stated as one type or illustration of taxable real estate under section 201 of the General County Assessment Law of May 22, 1933, P. L. 853, as amended, 72 PS §5020-201, is not specifically mentioned in corresponding section 201 of the presently applicable Fourth to Eighth Class County Assessment Law, hereinabove quoted, which was derived therefrom. The contention is that the change in statutory language evidences a change in legislative intent. Without quarrelling with this general proposition as a factor to be considered in construing ambiguous or debatable legislative enactments, we believe the principle to be ineffective to reach the argued result under the circumstances here presented, considered in light of the legislative background and certain judicial precedents previously concerned with the same problem.

In the first place, it is not at all clear, as would seem to be a necessary premise for the argument, that the term "wharves" is necessarily equivalent or comparable to the facilities under consideration, which embody much more than the mere idea of a "wharf". The latter would connote a simple platform or structure for landing or unloading from waterborne vessels. Moreover, the "wharves" mentioned in the 1933 statute, and omitted from mention in the 1943 enactment, would ostensibly seem to be much more nearly parallel to the term "loading docks" which the Supreme Court went out of its way to single out as an illustrative item of general benefit to the land which should have been included in the Jones and Laughlin assessment, 405 Pa. at 432, under the latter statute. This result, it should be noted, was reached notwithstanding the silence of the legislature as to the taxability of "wharves" or "docks" as items of particular specification.

Finally, and more fundamentally, the general statutory intent is manifest in both the General County Assessment Law and the Fourth to Eighth Class County Assessment Law to subject *all* real estate of *any* nature and kind to taxation, subject, of course, to the machinery exclusion herein discussed and such exemptions as may be allowed by law, with particular categories specified, possibly out of an unnecessary abundance of caution but legally of only illustrative significance. Neither statute is confined to a mere listing of specific objects of real estate subject to tax; both include "*All* real estate, to wit: . . . [listing specific examples] and *all other* real estate not exempt by law from taxation." (Italics supplied.)

The same type of argument as here urged was made in Patterson v. Delaware County, 70 Pa. 381, that machinery was not taxable real estate under the "assembled industrial plant doctrine" because it was not one of the precise categories mentioned in the pertinent statute, and in United Laundries, Inc. v. Board of Property Assessment, Appeals and Review, 359 Pa. 195, that machinery and equipment of commercial laundries, concededly not mills or manufactories, should likewise not be considered real estate under the "assembled industrial plant doctrine" since laundries were not industrial plants nor were they expressly listed in the assessment law. In both instances these arguments were rejected in view of the general and all-inclusive other language used by the legislature. In the United Laundries opinion, the court observed, in a context equally relevant to the instant case: 359 Pa. at 199, ". . . The statute [the General County Assessment Law] specifically set forth certain subjects, and then, rather than attempt to enumerate all of the numerous types of industrial plants, the catch-all words, 'all other real estate', were used. The act does not contain the word 'buildings', yet no one could seriously ques-

tion the fact that they, when appurtenant to the land, properly are assessable and taxable, under the general term of 'all other real estate . . .' "

So too, in the instant case, although the statute does not expressly mention vessel slips and turning basins, it cannot be denied that they constitue real estate in the conventional common law sense, and, to the extent not excluded by the industrial machinery statute, they are taxable under the general terms of the controlling legislation.

The Jones and Laughlin tests for the machinery exclusion as applied to particular aspects of the east wall or pier of the vessel slip, however, require further analysis and consideration. This structure, immediately adjoining the operations area of the mill proper as contrasted with the north and west walls which, from the photographs, appear to abut on presently undeveloped and unused land, is another multifunction facility, serving not only to bound and confine the waters of the vessel slip and constitute a conventional pier or dock, but also to provide broadbased concrete slab foundation support for two apparently different categories of railroad-type trackage, as well as, apparently, for other permanently constructed piers which in turn are the bases for certain equipment performing specified mechanical operations. One set of rails mounted on the slab of the vessel slip wall constitutes the supporting base for one leg of huge mobile mechanical unloaders which move along the vessel slip to remove the ore from the vessels docked there and deposit the same into the adjacent ore trough. There are also "specially designed" unloaders, cranes and conveyor systems "permanently affixed to the concrete piers for the exclusive purpose of unloading and blending bulk materials used in the manufacture of steel and steel products" [in the words of the stipulation, third paragraph, page 9]. The other set or sets of rails embedded

in the concrete of this wall or slab of the vessel slip are conventional railroad tracks for cars used to transship iron ore discharged from ocean-going vessels docked in the slip, which ore is not used in the Fairless Works but is transported by rail to Pittsburgh. Also embedded in this concrete dock is a 440 volt electrical cable or power circuit, the original function of which related to the ore unloading process, but which is no longer used for any purpose.

The rather inadequate description in the stipulation of the structural interrelationship and reasonably identifiable degree of separability of the physical components of the various aspects of these last described facilities in or upon the east wall and concrete slab of the vessel slip renders it difficult for us to be certain and positive in our characterization of some of the respective features thereof. The stipulation would probably have been more informative in this connection had the Jones and Laughlin opinion been filed when it was drawn. We will venture alternative conclusions, however, with the hope that the parties may arrive at an amicable or working understanding between themselves in light of such conclusions.

It would seem clear that the pier wall and concrete slab of the vessel slip, as such, and the electrical circuit and conventional transshipment railroad tracks embedded therein, would be general purpose facilities not integrally or solely provided for the steel manufacturing process, and hence should not be excluded from the assessment. It would seem equally clear, on the other side of the coin, that the mechanical unloaders, cranes, conveyor systems and other similar equipment in the nature of pure machinery would be in the classification of limited purpose material-handling devices discussed above and would therefore be excluded whether they be permanently affixed or mobile. For the considerations stated in the Jones and Laughlin case already re-

ferred to, the foundations and supports *solely* necessary for and inseparably a part of such pure machinery should also be in the excluded grouping. It is at this point that we run into uncertainty. We cannot determine, for example, whether the "concrete piers" to which the unloaders, cranes and conveyor systems are affixed, as mentioned in the third paragraph, page 9 of the stipulation above quoted, are structuarlly separate from, and distinctly independent of, the pier wall and overall concrete slab, so that the exclusive nature of their machinery-supporting function, like that of the *Overhead Crane Rails*, item no. 17, discussed supra, may unequivocally be established; or whether, on the other hand, like item no. 16, the oversized foundations and supports inseparably serving both machinery and buildings, also discussed supra under contrasting considerations and result, the foundation feature attributable to the unloading machinery is merged in, and cannot practically be isolated from, the similar function provided for other and nonexcluded aspects of the whole mass of the pier wall and concrete slab. In this connection, photograph numbered 5.3 would seem to indicate that the actual rails and ties serving the large traveling unloaders might be identifiable, and hence excluded, as solely and exclusively furnished for support and mobile operation of those devices, but that the concrete base upon which they rest would seem to be indistinguishable from the general structure of the pier wall and slab of the vessel slip.

### Order

And now, this March 23, 1962, the foregoing opinion is filed as the disposition by the court of the preliminary issues contemplated by paragraph (2) of the pretrial order heretofore entered by the court on September 22, 1960; pursuant to paragraph (6) of said order, April 30, 1962, at 1:30 p.m. is hereby fixed as the time

for a further pretrial conference to define and fix the scope, time and manner of procedure to a final determination of the subject appeals.